UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBIN S. WILLIAMS,

Plaintiff,

v.

GENERAL MOTORS LLC,

Defendant.

Case No.

Hon.

---

## COMPLAINT AND JURY DEMAND

Plaintiff Robin S. Williams, by and through her undersigned counsel, files this Complaint against Defendant General Motors LLC and states as follows:

### INTRODUCTION

1. This is an employment discrimination, retaliation, and disability-rights action arising from Defendant General Motors LLC's treatment of Plaintiff Robin S. Williams during and after a discriminatory performance review and compensation process.

2. Plaintiff is a Black woman over the age of 40 with a known disability.

3. Plaintiff worked for Defendant for approximately 26 years and had a long record of successful performance.

4. In 2024, Plaintiff received positive feedback, formal recognitions, and a positive midyear review.

5. Despite that record, Defendant suddenly issued Plaintiff a negative year-end evaluation in early 2025, denied her annual increase, and paid only 50% of her bonus.

6. Defendant's stated reasons for the negative evaluation were inconsistent with Plaintiff's documented performance, contradicted her prior positive review and recognitions, and relied on subjective criticisms that had not been communicated to Plaintiff during the performance year.

7. Plaintiff was the oldest person on her immediate team and the only Black woman on that team.

8. Defendant treated younger and white employees more favorably with respect to team inclusion, work allocation, reorganization input, scrutiny, and performance expectations.

9. Plaintiff also had a known disability, including depression, which Defendant had known about since at least 2009.

10. Defendant's discriminatory and retaliatory treatment materially worsened Plaintiff's condition, triggered a serious depressive episode, and caused Plaintiff to require approved medical leave beginning March 17, 2025.

11. While Plaintiff was on approved disability leave, Defendant's Human Resources representative contacted Plaintiff, pressed her about her return-to-work timing, and relied on false information that leadership had tried to call or text her.

12. Plaintiff does not allege that her approved medical leave, by itself, constituted a resignation, termination, or constructive discharge.

13. Plaintiff alleges that Defendant's unlawful conduct caused and prolonged her disability-related leave, reduced her compensation, damaged her employment standing, and left her without a good-faith, non-retaliatory return-to-work path.

14. In the alternative, to the extent Defendant contends Plaintiff's employment ended, that Plaintiff abandoned her position, or that Plaintiff voluntarily separated by not returning from disability leave, Plaintiff alleges that any such separation was a constructive discharge caused by Defendant's unlawful conduct.

15. Plaintiff seeks all available legal and equitable relief for Defendant's unlawful discrimination, retaliation, disability discrimination, failure to accommodate, failure to engage in a good-faith interactive process, and related misconduct.

## PARTIES

16. Plaintiff Robin S. Williams is an individual residing in Flint, Michigan.

17. Plaintiff is a Black woman.

18. Plaintiff was born on December 7, 1970, and was 55 years old during the relevant events.

19. Plaintiff has a disability within the meaning of federal and Michigan law, including depression and related mental-health impairments that substantially limit one or more major life activities when active.

20. Defendant General Motors LLC is a limited liability company doing business in Michigan.

21. Defendant employed Plaintiff and was Plaintiff's employer within the meaning of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Elliott-Larsen Civil Rights Act, and the Michigan Persons with Disabilities Civil Rights Act.

22. Defendant employed more than 500 employees during the relevant period.

23. Defendant maintained operations in Warren, Michigan, including at or near the GM Technical Center/Cole Engineering Tower, where Plaintiff worked in Global Purchasing & Supply Chain.

## JURISDICTION AND VENUE

24. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims arising under federal law, including Title VII, the ADEA, and the ADA.

25. This Court has supplemental jurisdiction over Plaintiff's related Michigan-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiff's federal claims.

26. Venue is proper in this District under 28 U.S.C. § 1391 because the unlawful employment practices occurred in Michigan, Defendant conducts business in this District, and Plaintiff worked for Defendant in this District.

27. Venue is also proper because Defendant's relevant worksite, decisionmakers, records, and witnesses are located in or connected to this District.

## ADMINISTRATIVE EXHAUSTION

28. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission.

29. The EEOC assigned Plaintiff's charge number 471-2026-04258.

30. Plaintiff's EEOC charge alleged discrimination and retaliation based on race, age, disability, hostile work environment, and protected activity.

31. The EEOC issued a Determination and Notice of Rights on July 27, 2026.

32. Plaintiff received official notice from the EEOC that she had the right to sue Defendant on the charge.

33. This action is timely filed within 90 days of Plaintiff's receipt of the EEOC's Notice of Rights.

## FACTUAL ALLEGATIONS

34. Plaintiff began working for Defendant in or around June 1999.

35. During her long tenure, Plaintiff held multiple roles and progressed within Defendant's organization.

36. Plaintiff worked as a Senior Supplier Coordinator on the Ship Direct team within Global Purchasing & Supply Chain.

37. Plaintiff's supervisors included Jacob "Jake" Brown, Team Leader, and Daniel Grivej, Manager.

38. Plaintiff had a long history of successful performance before the events at issue.

39. Plaintiff received positive feedback and recognitions throughout 2024.

40. Plaintiff received a positive midyear evaluation in 2024.

41. Plaintiff did not receive disciplinary action, warnings, a performance improvement plan, or corrective coaching during 2024.

42. Plaintiff's 2024 work included supplier recovery, supplier communication, capacity planning, strike mitigation, holiday planning, backorder reduction, and quality issue resolution.

43. Plaintiff was formally recognized throughout 2024 for leadership, customer focus, proactive planning, supplier recovery, communication, and cross-functional collaboration.

44. Plaintiff was recognized as a key contributor to backorder reduction and strike recovery.

45. Plaintiff's work required her to coordinate with suppliers, internal teams, product managers, buyers, leadership, and Penske coordinators.

46. Beginning in or around May 2024, Penske assumed part-specialist support.

47. Plaintiff worked with approximately nine rotating Penske coordinators because of turnover and reassignment.

48. Plaintiff trained, coached, and supported Penske coordinators through calls, Teams chats, screen sharing, direct instruction, process explanations, and ongoing follow-up.

49. Plaintiff's coaching and supplier-support work were substantial and continuous.

50. Defendant later criticized Plaintiff for alleged deficiencies in coaching, communication, proactivity, and ownership, even though Defendant had not raised those concerns during the performance year.

51. Defendant also assigned Plaintiff high-touch and complex suppliers, including higher-volume suppliers and suppliers with more complex processes.

52. Plaintiff was assigned burdensome work that was not equally imposed on younger and non-black employees.

53. Plaintiff's workload and support instability made her work materially more difficult than that of similarly situated employees.

54. Plaintiff and her immediate-team comparators worked in the same functional area, reported through the same management structure, were subject to the same review and ranking process, and performed supplier-coordination work under the same general standards.

55. Plaintiff's assigned suppliers included high-volume and complex suppliers that generated substantial backorder, past-due, recovery, communication, and coordination demands.

56. Plaintiff's workload was made more difficult by the instability of Penske coordinator support. Plaintiff worked with approximately nine rotating Penske coordinators, repeatedly trained and retrained them, and continued to manage supplier performance while support personnel changed without advance notice.

57. Defendant nevertheless criticized Plaintiff for alleged coaching, communication, urgency, and proactivity issues without applying the same level of scrutiny to younger and white employees who did not carry the same combination of complex supplier assignments and support instability.

58. During a departmental reorganization, white coworkers were permitted to give input regarding the reorganization and choose preferred work.

59. Plaintiff was not afforded the same opportunity.

60. Plaintiff was the oldest person on her immediate team.

61. Plaintiff was the only Black woman on her immediate team.

62. Plaintiff's team included younger employees, including employees with young children and one employee who was pregnant.

63. Plaintiff reported that she did not fit within the team dynamic.

64. Plaintiff reported that management treated her as an outsider.

65. Plaintiff reported these concerns to Jacob Brown, a Caucasian Team Leader approximately 38 to 40 years old.

66. Plaintiff's concerns were dismissed and Plaintiff was eventually retaliated against for raising these concerns.

67. Plaintiff had previously engaged in protected activity by raising those concerns and also filing an internal Aware Line complaint in or around October or November 2023 concerning harassment and conduct she believed was threatening.

68. Plaintiff reasonably believed she was targeted after raising concerns and submitting that complaint through Defendant's review and ranking process, exclusion from reorganization input, and heightened scrutiny.

69. The challenged 2024 year-end review was the first full performance review cycle after Plaintiff's 2023 Aware Line complaint and directly in time after raising the verbal concerns.

70. Before that review, Plaintiff had received a positive 2023 annual review, positive 2024 midyear feedback, multiple 2024 recognitions, and no discipline, warnings, performance improvement plan, or corrective coaching.

71. Defendant's criticisms appeared only after Plaintiff engaged in protected activity and after Plaintiff was excluded from the same planning and work-allocation input afforded to white and younger coworkers.

72. The timing, the absence of prior coaching, the use of subjective and uncommunicated standards, the contradiction between Plaintiff's documented performance and the negative review, and the resulting compensation penalty support a reasonable inference of retaliation.

73. In or around January 2025, Plaintiff unexpectedly received a negative 2024 year-end evaluation.

74. The evaluation rated Plaintiff as only partially meeting expectations.

75. The negative evaluation was inconsistent with Plaintiff's positive 2024 feedback, formal recognitions, and positive midyear review.

76. The negative evaluation was not preceded by documented coaching, corrective feedback, warning, progressive discipline, or a performance improvement plan.

77. As a direct result of the negative review and ranking process, Plaintiff received no annual increase.

78. Plaintiff's annual increase was typically approximately 3%.

79. Plaintiff also received only 50% of her bonus.

80. Defendant's actions materially affected Plaintiff's compensation, employment standing, and career trajectory.

81. Plaintiff disputed the year-end review at the team-leader level, manager level, and with Human Resources.

82. In or around March 2025, during Plaintiff's dispute of the review, Defendant's manager stated that Plaintiff's positive midyear review was "just being nice."

83. That statement indicated that Defendant's earlier written positive feedback had not been candidly or consistently used in the review process.

84. During the same general period, Plaintiff questioned whether she had failed to meet any clearly communicated performance or communication standard.

85. Defendant's manager acknowledged that no such standard had been communicated.

86. Defendant's manager nevertheless compared Plaintiff's prior functional background to manufacturing and stated, in substance, that people from CCA did not have the same "sense of urgency" required when manufacturing lines are at risk.

87. Defendant used subjective, shifting, and previously uncommunicated expectations to justify Plaintiff's negative evaluation.

88. Plaintiff's negative evaluation, compensation loss, and discriminatory and retaliatory treatment materially worsened her medical condition.

89. Plaintiff has depression, including major depressive episodes and/or Major Depressive Disorder, which when active substantially limits sleeping,

concentrating, thinking, communicating, interacting with others, caring for herself, brain function, and working.

90. Plaintiff had been diagnosed since in or around 2009.

91. Defendant had known of Plaintiff's disability since at least 2009.

92. In 2009, Plaintiff was hospitalized due to her disability and had to meet with Defendant's medical department before returning to work.

93. In or around 2010 or 2011, Plaintiff was treated by Defendant's EAP medical doctor.

94. In or around 2013 or 2014, Plaintiff's psychiatrist submitted an accommodation request to change Plaintiff's work assignment from warehouse operations to headquarters because of medication requirements and work schedule.

95. Plaintiff's disability was therefore known to Defendant well before the events at issue.

96. Plaintiff's condition is episodic and substantially limiting when active. During active episodes, Plaintiff experiences substantial limitations in sleep, concentration, thinking, communication, interaction with others, self-care, brain function, and work.

97. During the 2025 episode, Plaintiff experienced a prolonged period in which she struggled to get out of bed, had a bleak and hopeless outlook, required

medication changes and increases, and worked with her therapist regarding sleep, interaction with others, daily functioning, and readiness to return to work.

98. Plaintiff's 2025 disability-related leave was not based on ordinary workplace stress. It followed a documented history of disability known to Defendant since 2009, including hospitalization, Defendant's medical return-to-work process, EAP medical treatment, prior psychiatric accommodation documentation, and ongoing psychiatric care.

99. Plaintiff's treating psychiatric provider removed Plaintiff from work beginning March 17, 2025, and Plaintiff's providers continued to monitor and reevaluate her work status.

100. In early 2025, the stress from Defendant's treatment triggered a major depressive episode.

101. Plaintiff sought medical treatment.

102. Plaintiff's psychiatric provider placed Plaintiff off work beginning March 17, 2025.

103. Plaintiff's provider documented that Plaintiff needed to be off work from March 17, 2025, through April 16, 2025, to prioritize rest and recovery.

104. Plaintiff's leave began on March 17, 2025.

105. Plaintiff was placed on approved medical leave through Defendant's leave administrator, Sedgwick.

106. Plaintiff complied with Defendant's leave requirements.

107. Plaintiff continued treatment with therapy and psychiatric care.

108. Plaintiff's provider reevaluated her work status approximately every 30 days.

109. Plaintiff initially received short-term disability benefits.

110. Plaintiff later transitioned to reduced disability pay.

111. Defendant's discriminatory and retaliatory conduct caused Plaintiff to suffer wage loss and benefits-related loss associated with disability leave.

112. While Plaintiff was on approved medical leave, Defendant contacted her regarding her return-to-work timing.

113. Plaintiff's medical leave was a finite and medically supervised accommodation. Plaintiff's provider initially removed her from work for 30 days beginning March 17, 2025, and thereafter reevaluated Plaintiff's work status approximately every 30 days.

114. Plaintiff was not seeking to avoid performing the essential functions of her position permanently. Plaintiff sought medically necessary leave and a good-faith, non-retaliatory return-to-work process that would allow her to return when medically cleared.

115. Reasonable accommodations available to Defendant included continued medically supported leave subject to periodic provider reevaluation, routing

nonessential work-related contact through Sedgwick or counsel while Plaintiff remained on leave, a documented interactive-process meeting before return, confirmation of Plaintiff's same or equivalent position, and a return-to-work plan that addressed disability-related restrictions and avoided retaliatory or disproportionate assignments.

116. Reasonable accommodations also included correcting, removing, or confirming the nonuse of the disputed performance review and related ranking consequences to the extent they created an ongoing barrier to Plaintiff's safe and non-retaliatory return to work.

117. On or about December 8, 2025, Sydney Edwards, Defendant's Human Resources Business Partner, contacted Plaintiff.

118. During that contact, Ms. Edwards stated that leadership had called and texted Plaintiff and that Plaintiff had been unresponsive.

119. Plaintiff had not received such calls or texts.

120. Plaintiff told Ms. Edwards that no one had reached her.

121. Plaintiff attempted to discuss her dispute regarding the evaluation.

122. Ms. Edwards stated she could only discuss "work" when Plaintiff returned, while continuing to press Plaintiff regarding a return date.

123. The December 8, 2025 contact caused Plaintiff additional stress and was a setback in her recovery.

124. Plaintiff asked Sedgwick and her medical providers to document that she was being contacted while on leave and questioned about whether she planned to return.

125. Plaintiff was supposed to return to work on or about January 18, 2026, subject to provider evaluation.

126. Plaintiff did not return to work by that date because she continued to recover from the serious depressive episode triggered and worsened by Defendant's conduct.

127. Defendant failed to provide Plaintiff with a good-faith, non-retaliatory return-to-work process.

128. Defendant failed to reasonably address the discriminatory review, compensation consequences, workload concerns, heightened scrutiny, and retaliatory environment that had contributed to Plaintiff's disability-related leave.

129. Defendant failed to correct or remove the discriminatory performance review and related ranking consequences.

130. Defendant failed to engage in a good-faith interactive process regarding Plaintiff's disability-related limitations, medical leave, and return-to-work needs.

131. Plaintiff alleges, in the alternative, that if Defendant contends Plaintiff's employment ended because she did not return from disability leave, any such

separation was caused by Defendant's discriminatory, retaliatory, and disability-related misconduct.

132. Plaintiff alleges, in the alternative, that Defendant's conduct made return objectively intolerable by leaving in place the discriminatory review, compensation penalty, ranking consequences, subjective criticisms, disproportionate workload, heightened scrutiny, and retaliatory conditions that caused or worsened Plaintiff's medical leave.

133. Plaintiff alleges, in the alternative, that any claimed separation was a constructive discharge and not a voluntary abandonment or voluntary resignation.

134. Defendant's discriminatory and retaliatory conduct caused Plaintiff to suffer wage loss and benefits-related loss associated with disability leave.

135. Defendant's conduct caused Plaintiff economic damages, including lost compensation, loss of annual increase, loss of bonus, wage loss, benefits-related losses, and future earning losses.

136. Defendant's conduct caused Plaintiff non-economic damages, including emotional distress, humiliation, anxiety, exacerbation of depression, loss of enjoyment of life, and reputational harm.

137. Defendant's conduct was willful, intentional, reckless, and/or undertaken with deliberate indifference to Plaintiff's protected rights.

**COUNT I**
**RACE DISCRIMINATION IN VIOLATION OF TITLE VII**

138. Plaintiff incorporates all preceding paragraphs as though fully restated.

139. Title VII prohibits an employer from discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment because of race.

140. Plaintiff is Black.

141. Plaintiff was qualified for her position and performed her job satisfactorily.

142. Plaintiff received positive feedback, formal recognitions, and a positive midyear review in 2024.

143. Defendant subjected Plaintiff to adverse employment actions, including a negative year-end review, denial of an annual increase, reduction of her bonus, unequal work assignments, exclusion from reorganization input, heightened scrutiny, leave-related wage loss, and damage to her employment standing.

144. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was an adverse employment action caused by Defendant's discriminatory and retaliatory conduct.

145. Plaintiff was treated less favorably than similarly situated white employees.

146. White employees were permitted to provide input regarding work allocation and reorganization while Plaintiff was not.

147. White employees were not burdened with the same disproportionate high-touch and complex supplier assignments imposed on Plaintiff.

148. Defendant relied on subjective and shifting criticisms that contradicted Plaintiff's documented performance.

149. Defendant's conduct supports a reasonable inference that race was a motivating factor in the adverse employment actions taken against Plaintiff.

150. Defendant's race discrimination caused Plaintiff damages.

## COUNT II
## RACE DISCRIMINATION IN VIOLATION OF MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT

151. Plaintiff incorporates all preceding paragraphs as though fully restated.

152. Plaintiff is a member of a protected class based on race.

153. Defendant was Plaintiff's employer within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

154. Plaintiff was qualified for her position.

155. Defendant treated Plaintiff differently and less favorably than similarly situated white employees in compensation, performance evaluation, work allocation, reorganization input, scrutiny, employment conditions, and return-to-work treatment.

156. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was caused by Defendant's discriminatory and retaliatory conduct.

157. Race was a motivating factor in Defendant's unlawful conduct.

158. Defendant's race discrimination violated Michigan law and caused Plaintiff damages.

## COUNT III
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA

159. Plaintiff incorporates all preceding paragraphs as though fully restated.

160. The ADEA prohibits an employer from discriminating against an employee who is 40 years of age or older with respect to compensation, terms, conditions, or privileges of employment because of age.

161. Plaintiff was 55 years old during the relevant events.

162. Plaintiff was the oldest person on her immediate team.

163. Plaintiff was qualified for her position and had a long record of satisfactory performance.

164. Defendant subjected Plaintiff to adverse employment actions, including a negative year-end review, loss of annual increase, reduced bonus, unequal work assignments, heightened scrutiny, leave-related wage loss, and damage to her employment standing.

165. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was an adverse employment action caused by Defendant's discriminatory and retaliatory conduct.

166. Younger employees were treated more favorably than Plaintiff, including with respect to team inclusion, work allocation, and reorganization input.

167. Defendant's use of subjective and shifting performance criticisms after a positive performance history supports a reasonable inference of age discrimination.

168. Plaintiff's age was the but-for cause of, or a determining factor in, Defendant's adverse actions.

169. Defendant's age discrimination caused Plaintiff damages.

## COUNT IV
## AGE DISCRIMINATION IN VIOLATION OF MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT

170. Plaintiff incorporates all preceding paragraphs as though fully restated.

171. Plaintiff is protected from age discrimination under Michigan law.

172. Defendant treated Plaintiff less favorably than younger employees in the terms, conditions, and privileges of employment.

173. Defendant subjected Plaintiff to adverse employment actions, including compensation loss, negative review, unequal workload, exclusion, heightened scrutiny, leave-related wage loss, and damage to employment standing.

174. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was caused by Defendant's discriminatory and retaliatory conduct.

175. Plaintiff's age was a motivating factor in Defendant's unlawful conduct.

176. Defendant's conduct violated Michigan law and caused Plaintiff damages.

## COUNT V
## DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

177. Plaintiff incorporates all preceding paragraphs as though fully restated.

178. The ADA prohibits discrimination against a qualified individual on the basis of disability.

179. Plaintiff has a disability within the meaning of the ADA.

180. Plaintiff has a record of disability.

181. Defendant regarded Plaintiff as having a disability.

182. Defendant knew of Plaintiff's disability since at least 2009.

183. Plaintiff was qualified to perform the essential functions of her position with or without reasonable accommodation.

184. Plaintiff had successfully performed her work for many years.

185. Defendant discriminated against Plaintiff because of her disability by subjecting her to adverse actions, including negative evaluation, compensation loss, heightened scrutiny, leave-related pressure, failure to provide a good-faith return-to-work process, and disability-leave-related wage loss.

186. Defendant's conduct occurred after Plaintiff's disability-related condition worsened and after Plaintiff required medical leave.

187. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was caused by Defendant's disability discrimination and failure to reasonably accommodate Plaintiff.

188. Defendant's disability discrimination caused Plaintiff damages.

## COUNT VI
## FAILURE TO ACCOMMODATE / FAILURE TO ENGAGE IN INTERACTIVE PROCESS IN VIOLATION OF THE ADA

189. Plaintiff incorporates all preceding paragraphs as though fully restated.

190. Plaintiff was an individual with a disability within the meaning of the ADA.

191. Defendant knew of Plaintiff's disability.

192. Plaintiff required medical leave and disability-related protection because of her condition.

193. Plaintiff provided Defendant with notice of her disability-related limitations and need for leave through medical documentation and Defendant's leave process.

194. Plaintiff's medical leave was a reasonable accommodation.

195. Defendant failed to reasonably accommodate Plaintiff by pressuring her regarding return-to-work timing while she remained on approved medical leave.

196. Defendant failed to engage in a good-faith interactive process regarding Plaintiff's disability-related limitations, leave status, return-to-work needs, and need for a non-retaliatory work environment upon return.

197. Instead, Defendant contacted Plaintiff while she was on leave, falsely stated that leadership had attempted to contact her, and pressed her regarding a return date.

198. Defendant failed to provide a meaningful return-to-work process that addressed the discriminatory review, compensation consequences, workload concerns, and retaliatory environment that had contributed to Plaintiff's disability-related leave.

199. Defendant failed to reasonably assure Plaintiff that she could return without the same discriminatory review consequences, disproportionate work assignments, heightened scrutiny, and retaliatory treatment continuing to affect her employment.

200. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation was the foreseeable result of Defendant's failure to accommodate and failure to engage in a good-faith interactive process.

201. Defendant's failure to accommodate and failure to engage in an interactive process caused Plaintiff damages.

## COUNT VII
## DISABILITY DISCRIMINATION IN VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

202. Plaintiff incorporates all preceding paragraphs as though fully restated.

203. Plaintiff is protected under Michigan's Persons with Disabilities Civil Rights Act.

204. Plaintiff had a disability, a record of disability, and/or was regarded as disabled.

205. Plaintiff was qualified for her position with or without accommodation.

206. Defendant treated Plaintiff adversely because of her disability and disability-related leave.

207. Defendant failed to reasonably address Plaintiff's disability-related needs.

208. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation was caused by Defendant's disability discrimination and failure to reasonably accommodate Plaintiff.

209. Defendant's conduct violated Michigan law and caused Plaintiff damages.

## COUNT VIII
## RETALIATION IN VIOLATION OF TITLE VII

210. Plaintiff incorporates all preceding paragraphs as though fully restated.

211. Plaintiff engaged in protected activity by opposing and reporting discrimination, including through Defendant's internal Aware Line process and by disputing discriminatory treatment.

212. Plaintiff filed an Aware Line report in or around October or November 2023 concerning harassment and conduct she believed was threatening.

213. Plaintiff later disputed Defendant's negative review and discriminatory treatment.

214. Defendant knew of Plaintiff's protected activity.

215. After Plaintiff engaged in protected activity, Defendant subjected her to adverse actions, including negative evaluation, compensation loss, exclusion from work allocation input, heightened scrutiny, leave-related pressure, disability-leave-related wage loss, and failure to provide a good-faith return-to-work process.

216. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was caused by Defendant's retaliation.

217. The timing, shifting explanations, and inconsistency between Plaintiff's documented performance and Defendant's later criticisms support a causal connection between Plaintiff's protected activity and Defendant's adverse actions.

218. Defendant retaliated against Plaintiff in violation of Title VII.

219. Defendant's retaliation caused Plaintiff damages.

**COUNT IX**
**RETALIATION IN VIOLATION OF THE ADA**

220. Plaintiff incorporates all preceding paragraphs as though fully restated.

221. Plaintiff engaged in ADA-protected activity by asserting disability-related rights, seeking and using medical leave, providing medical documentation, and opposing disability-related mistreatment.

222. Defendant knew Plaintiff was on approved medical leave because of her medical condition.

223. Defendant subjected Plaintiff to adverse actions after and because of her protected activity, including leave-related pressure, failure to engage in a good-faith interactive process, continuing scrutiny, disability-leave-related wage loss, and failure to provide a good-faith return-to-work process.

224. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was caused by Defendant's ADA retaliation.

225. Defendant's actions would dissuade a reasonable employee from exercising rights protected by the ADA.

226. Defendant's ADA retaliation caused Plaintiff damages.

**COUNT X**
**RETALIATION IN VIOLATION OF THE ADEA**

227. Plaintiff incorporates all preceding paragraphs as though fully restated.

228. Plaintiff engaged in protected activity by opposing and disputing discriminatory treatment based, in part, on age.

229. Defendant knew Plaintiff opposed age-based discrimination.

230. Defendant subjected Plaintiff to materially adverse actions after she opposed discrimination.

231. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was caused by Defendant's retaliation.

232. Plaintiff's protected activity was a but-for cause of Defendant's retaliatory conduct.

233. Defendant's retaliation violated the ADEA and caused Plaintiff damages.

## COUNT XI
## RETALIATION IN VIOLATION OF MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT

234. Plaintiff incorporates all preceding paragraphs as though fully restated.

235. Plaintiff engaged in protected activity under Michigan law by reporting, opposing, and disputing discriminatory treatment.

236. Defendant knew of Plaintiff's protected activity.

237. Defendant retaliated against Plaintiff by subjecting her to adverse employment actions, including negative review, compensation loss, exclusion,

heightened scrutiny, leave-related pressure, disability-leave-related wage loss, and failure to provide a good-faith return-to-work path.

238. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the separation itself was caused by Defendant's retaliation.

239. Defendant's retaliation violated Michigan law and caused Plaintiff damages.

## COUNT XII
## HOSTILE WORK ENVIRONMENT UNDER TITLE VII AND MICHIGAN LAW

240. Plaintiff incorporates all preceding paragraphs as though fully restated.

241. Plaintiff was subjected to unwelcome conduct based on race and protected activity.

242. Plaintiff was treated as an outsider in her immediate team.

243. Plaintiff was the only Black woman on her immediate team.

244. Plaintiff reported that she did not fit within the group dynamic, but her concern was dismissed.

245. Plaintiff was excluded from planning and work-allocation discussions afforded to white coworkers.

246. Plaintiff was assigned disproportionately complex work and then criticized under subjective expectations.

247. Plaintiff was subjected to shifting and inconsistent performance standards.

248. Defendant's conduct unreasonably interfered with Plaintiff's work environment and contributed to the deterioration of her medical condition.

249. In the alternative, if Defendant contends Plaintiff's employment ended because she did not return from disability leave, Plaintiff alleges that the hostile work environment contributed to and caused that separation.

250. Defendant knew or should have known of the hostile environment and failed to take prompt and appropriate corrective action.

251. Defendant's hostile work environment caused Plaintiff damages.

**DAMAGES**

252. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages including, but not limited to:

a. lost wages;
b. lost annual increase;
c. lost bonus compensation;
d. loss of employment benefits;
e. wage loss associated with disability leave caused or prolonged by Defendant's unlawful conduct;
f. in the alternative, back pay, front pay or reinstatement, and other wage loss resulting from any separation Defendant contends occurred after Plaintiff did not return from disability leave;
g. loss of earning capacity;
h. emotional distress;
i. humiliation, embarrassment, and mental anguish;
j. exacerbation of medical condition;
k. loss of professional standing;
l. attorneys' fees and costs;
m. interest; and
n. all other damages recoverable by law.

253. Defendant's conduct was intentional, willful, reckless, malicious, and/or undertaken with deliberate indifference to Plaintiff's protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and award the following relief:

A. Declaratory judgment that Defendant violated Plaintiff's rights under federal and Michigan law;
B. Back pay, lost benefits, disability-leave-related wage loss caused or prolonged by Defendant's unlawful conduct, and all other economic damages;
C. In the alternative, back pay, front pay or reinstatment, and lost benefits resulting from any separation Defendant contends occurred after Plaintiff did not return from disability leave;
D. Front pay or other prospective economic relief to the extent reinstatement or return to work is not feasible;
E. Compensatory damages for emotional distress, humiliation, mental anguish, reputational harm, medical-condition aggravation, and other non-economic losses;
F. Liquidated damages under the ADEA for willful age discrimination, as applicable;
G. Exemplary damages to the extent permitted under Michigan law;
H. Punitive damages to the extent permitted under federal law;
I. Prejudgment and post-judgment interest;
J. Reasonable attorneys' fees and costs;
K. Equitable relief, including correction or removal of the challenged performance review and related ranking or calibration records;
L. A good-faith interactive process and non-retaliatory return-to-work process, if medically appropriate;
M. An order requiring Defendant to cease discrimination and retaliation;
N. Any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 22, 2026

Respectfully submitted,

CARLA D. AIKENS, P.L.C.

By: /s/ *Connor B. Gallagher* _____
Carla D. Aikens (P69530)
Connor B. Gallagher (P82104)
615 Griswold St., Ste. 709
Detroit, MI 48226
Telephone: (844) 835-2993
Fax: (877) 454-1680
Email: carla@aikenslawfirm.com
Email: connor@aikenslawfirm.com
*Attorney for Plaintiff Robin S. Williams*